67 So.2d 193 (1953)
THE MACCABEES
v.
TERRY.
Supreme Court of Florida, Division B.
July 31, 1953.
Rehearing Denied September 21, 1953.
Morehead, Forrest, Gotthardt & Orr and F.E. Gotthardt, Miami, for petitioner.
Boyce F. Ezell, Jr., Miami, for respondent.
DREW, Justice.
A petition for constitutional certiorari has been filled in this Court to review an order of the Circuit Court of Dade County affirming a judgment against petitioner in the Civil Court of Record of Dade County on double indemnity provisions of a policy of insurance and awarding attorney's fees under Section 625.08, F.S.A., to beneficiary's counsel.
The bone of contention here as to the first point is that the Circuit Court of Dade County, in affirming the judgment of the Civil Court of Record of said county, "refused to recognize that the medical testimony *194 which was uncontradicted failed to show that the accused had met an accidental death in accordance with the provisions of the double indemnity agreement" and that, therefore, said Circuit Court had failed to proceed in accordance with the requirements of law.
The provisions of the insurance policy involved here are:
(The Insurer) "A. Further agrees to pay the beneficiary an additional amount equal to the face amount of the benefit certificate referred to above in the event that said member suffers death as a direct result of bodily injuries effected directly, exclusively and independently of all other causes, through external, violent and accidental means, within ninety days from date of accident, * * *
* * * * * *
"The liability of the Association hereunder is conditioned upon the following: That the member be in good standing as a Life Benefit Member of the Association at time of death; that the certificate be in full force and effect and not running as extended or paid-up protection; that such death or accident shall not result directly or indirectly from: suicide while sane or insane, taking of poison or inhaling of gas, whether voluntary or otherwise, bodily injuries received during a state of war, riot or insurrection, or while the member is violating the penal laws of the land constituting a felony, or as a result or penalty of such violation, or while the member is riding or being in or on any aeronautical or submarine device or conveyance or participating in any operation thereof, except as a fare-paying passenger on licensed aircraft, piloted by a licensed pilot in regularly scheduled flight; or from illness, disease, or from physical or mental infirmity, or while member is outside of the limits of the continental United States or Canada. Except in case of drowning or internal injuries revealed by an autopsy, the injuries must be evidenced by a visible contusion or wound on the exterior of the body." (Emphasis added.)
At the time of his death, the deceased was a carpenter by trade and had been engaged in such occupation for about 13 years. He was a vigorous man and had been in excellent health for many years. The testimony revealed that while he was not constantly engaged in "heavy and strenuous work" he frequently did such work in his trade. The undisputed evidence shows that death resulted from a ruptured aneurysm in the brain brought about by a strain.
There is little, if any, dispute as to the facts surrounding the injury. The deceased was engaged in replacing floor joists which had been broken as the result of a wall blowing over. Such work was not the usual work required of a carpenter and entailed working under the house in a very confined and cramped position and required a very strong man to utilize all his strength to get the new joists in position. In fact, the Negro helper assigned to help the deceased was picked because he was the strongest man on the job. What happened to the deceased is well summarized by the testimony of the Negro helper in the following questions and answers.
"Q. Did you notice anything unusual about Mr. Terry as he was straining under the building? A. Yes, sir, I noticed it.
"Q. What was that Johnny? A. I looked at him when we first go underneath there, and he was red when he come up to get the water. He turned a different color. He eyes look funny. `Mr. Terry,' I say, `It is hot underneath there,' and he say, `When I come out I ain't going back down there.' I say, `Yes, sir.' He drank one little dipper of water.
"Q. At any time while you were working with him underneath the building did he make any statement or complaints about his feeling? A. Yes, sir.

*195 "Q. What, if anything, did he say? A. Well, he was under there, he told me, he said, `Johnny, my head hurt.' I said, `You want me to go and get you a Stanback?' and he said, `No.' That was all he said. He just told me his head was hurting.
"Q. Did you suffer any yourself. Did you suffer any ill effects as a result of that work? A. I didn't right then but the next morning I could feel it. Everybody said, `You must be sick, Johnny,' and I said, `No, sir, I got overheated.' It didn't worry me right then."
On the question of the cause of death, the following is the pertinent testimony of Dr. Richard E. Strain, respondent's witness, on cross-examination:
"Q. Doctor, as I understand it, an aneurysm is a congenital condition, a weak spot in the blood vessel? A. Yes, sir.
"Q. And the rupture is the breaking of it? A. Yes.
"Q. Doctor, would I be correct in saying that the two of them, the two conditions I am referring to, the weakened condition and the strain, the weakened blood vessel or aneurysm or strain, would I be correct in saying that the two of them had to co-exist and work together causing the death of this man? A. I believe that is a correct statement, that he had to have a congenital weakness and a precipitating strain in this instance.
"Q. Now, then, am I correct in stating that the strain could not be said to have caused his death solely, exclusively and independently of all other causes? A. Well, I think it was a precipitating factor here. If he had not had a weakness, a congenital weakness, I don't believe this strain would have caused his death. It is like a man who develops a hernia.
"Q. In other words, would I be correct in saying that the strain did not cause his death solely, exclusively and independently of all other causes? A. He had to have a congenital weakness.
"Q. It would not be solely, exclusively and independently? A. In my opinion.
"Q. That would be your opinion? A. Yes, sir.
"Q. Doctor, this strain is not what you could call an injury effected solely through external, violent and accidental means, which injury is evidenced by a visible contusion or wound on the exterior of the body, is it? A. No; there was no external mark of violence on his body. He was not struck by something from the outside. This all happened in his brain.
"Q. And from the history that you got, there was nothing accidental about what happened, was there? A. I suppose that would depend upon what you mean by accidental. We call these a cerebral vascular accident. That means there was, or has been, a sudden, catastrophic happening in the brain, and from that point of view we use the term `accident.'
"Q. There was no external violence? A. No, there was no external violence.
"Q. And this strain did not cause any visible contusion or wound on the exterior of the body? A. No, sir.
"Q. And there was nothing in the autopsy that revealed any such thing? A. No, only the operative wound which, of course, was not healed.
* * * * * *
"Q. But not the sole and exclusive cause? A. Not the sole and exclusive cause; that is correct.
"Q. An aneurysm is not a normal condition, it it? A. No, sir, we would consider it an abnormal congenital condition, and a strain such as in passing a stool or coughing or doing any kind of *196 heavy thing might be sufficient to bring on a rupture and such an aneurysm may rupture without any noticeable strain in everyday living. They have been known to rupture in people's sleep. Whether they were straining at the time, we cannot say."
It is highly pertinent to emphasize that among the quoted provisions of the policy, supra, is one that, to paraphrase the expression, the association shall not be liable if death results directly or indirectly from physical or mental infirmity. Assuming, therefore, but not deciding, that the circumstances related above surrounding the injury constituted an accident within the policy provisions, we think the conclusion is inescapable that death resulted not solely and exclusively from such accident, but to say the very least, indirectly from a physical infirmity, viz.: an aneurysm. Infirm is defined by Webster as "not firm or sound physically" and he defines infirmity as "character or state of being infirm." The doctor's testimony establishes without question that an aneurysm is "a congenital weakness." This means exactly the same thing as "not firm or sound physically" and that is exactly what the policy provides the insurer shall not be liable for, if it causes death.
In 45 C.J.S., Insurance, § 938, page 1088, it is said:
"Additional or double indemnity. A clause making insurer liable for additional or double indemnity if insured's death results from a bodily injury effected solely by external, violent, and accidental means, commonly contains an exception which exempts insurer from such liability if the death results directly or indirectly from disease or bodily infirmity. Under these provisions, as construed together, according to the common meaning of the language used, double indemnity cannot be recovered if insured's death is not caused by an accident, but occurs as a consequence of an existing disease or bodily infirmity, or, under some policies, if it occurs as a result of insured's mental infirmity.
"If an accidental injury and the preexisting disease or infirmity cooperate in causing the death of insured, double indemnity cannot be recovered, even though the injury is an active, efficient, and procuring cause, provided the disease or infirmity contributes, either directly, or indirectly, to the causing of insured's death, or if, as has been held, the disease or infirmity is the proximate cause of insured's death. This rule applies where the preexisting disease so aggravates the effect of the accident, or the accident so aggravates the effect of the disease, that the accident would not have proved fatal except for the disease. * * *"
Couch on Insurance, Vol. 5, page 4011, on the same subject, observes:
"* * * So, death from an existing disease, accelerated and aggravated by a fall, both co-operating in the result, is not death proximately caused by violent, external, and accidental means. And although, if an existing but dormant disorder or disease is brought into activity by the accident, and death is caused wholly or in part by the disease, a question might fairly arise whether the accident was the proximate cause of death, the injury cannot be held the sole cause of death within a stipulation for liability only for injuries or accidents which are the sole proximate cause of death. Again, no recovery can be had for death contributed to by disease under a policy restricted to death caused solely and exclusively by accidental means, where the disease was not in fact caused by the accident. So, rupture of the heart, brought about by a fall on the pavement and insured's diseased condition, is not death by external, violent, and accidental means `independently of all other causes;' * *"
While there is some authority to the contrary, the great weight of authority (to *197 which we hereby subscribe) supports the conclusion reached by the two quotations immediately above. See Bates v. New York Life Ins. Co., D.C., 31 F. Supp. 813; Tucker v. New York Life Ins. Co., 107 Utah 478, 155 P.2d 173; Kirkwood v. London & Lancashire Indemnity Co. of America, 14 La. App. 438, 131 So. 703; Smith v. Massachusetts Bonding & Ins. Co., 207 App.Div. 682, 202 N.Y.S. 857; Stanton v. Travelers' Insurance Co., 83 Conn. 708, 78 A. 317, 34 L.R.A.,N.S., 445; National Masonic Accident Ass'n v. Shryock, 8 Cir., 73 F. 774; Hubbard v. Travelers Insurance Co., C.C., 98 F. 932; Illinois Commercial Mens Ass'n v. Parks, 7 Cir., 179 F. 794; Binder v. National Masonic Accident Ass'n, 127 Iowa 25, 102 N.W. 190; Howe v. National Life Ins. Co., 321 Mass. 283, 72 N.E.2d 425, 170 A.L.R. 1254; Towey v. New York Life Ins. Co., 27 Wash.2d 829, 180 P.2d 815; Annotations on the subject found in 131 A.L.R. 251 and 117 A.L.R. 739; Cretney v. Woodmen Accident Co., 196 Wis. 29, 219 N.W. 448, 62 A.L.R. 675; Crowder v. General Accident, Fire & Life Assurance Corp., 180 Va. 117, 21 S.E.2d 772; Herthel v. Time Insurance Co., 211 Wis. 208, 265 N.W. 575; Egan v. Preferred Accident Ins. Co., 223 Wis. 129, 269 N.W. 667, 107 A.L.R. 1107; Ryan v. Continental Casualty Co., 5 Cir., 47 F.2d 472.
Respondent strongly argues that Jones v. General Accident, Fire & Life Assurance Corp., 118 Fla. 648, 159 So. 804, is controlling in this case and clearly supports the judgments below. The provisions of the policy involved in that case were so different from those involved in the policy now before us that the holding there can be of little benefit in deciding this case. Moreover, as stated in the opinion, the policy did not have the very provision upon which we primarily base this opinion. The court said in that case, 159 So. at page 807:
"Differing from many others, the policy in this case does not expressly exclude liability when disability or death of the insured is caused directly or indirectly in whole or in part by any form or condition of disease. * *"
The judgment of the Civil Court of Record affirmed by the Circuit Court is hereby quashed.
ROBERTS, C.J., and THOMAS and HOBSON, JJ., concur.